**EXHIBIT H**

| | CUSTOM |
|---|---|
| Agreement # | 20N0084 |
| Rights Code | VIST |
| Template | VIST |
| Rev. Date | 1/1/2011 |

MF 11/23/22
tb 11.30.22

**November 17, 2022**

Ms. Annie Leibovitz
AL Studio, LLC
495 West Street, #5
New York, NY  10014

Dear Annie:

Advance Magazine Publishers Inc d/b/a Condé Nast ("Company") and AL Studio, LLC ("Contributor") f/s/o Annie Leibovitz ("Artist") agree as follows:

1. **Scope of Agreement:** From November 1, 2022 through April 30, 2024 (the "Term"), this agreement will govern each photographic shoot performed by Contributor for Company (a "Project"), specifically for *Vogue* magazine and *Vanity Fair* magazine, and/or for any other publication owned, published, or licensed by or affiliated with Company, whether existing or future, and whether the format of delivery is print, website, app (mobile, tablet, desktop, or otherwise), television, or other media not herein described (each hereinafter a "Publication") and all photographs or other material mutually agreed to by Company and Contributor taken at or created for each Project by Contributor (the "Works"). Individual Projects will be arranged on a case-by-case basis separately between each separate Publication and Contributor, in separate documents to be considered schedules hereto, including all specifics of each Project such as due date, subject matter, format, location, and expenses (the "Schedules"). A form of Schedule is attached as Exhibit A hereto, but the parties may use any written means that provides the necessary information.  All Schedules will constitute an integral part of this agreement and will be governed by the terms of this agreement.

2. **Services:**

   a. Throughout the Term, Contributor will provide thirty-five (35)  days of photography (the "Minimum Commitment").  It is hereby acknowledged that as of the date of execution of this Agreement, Contributor has already completed (2) days of the Minimum Commitment, as follows:  Kate Winslet for *Vogue* (2 days, November 11 & November 12),

   c. The nature and length of the Projects shall be determined by the Editor in Chief of the applicable Publication or his/her designee. Contributor agrees to travel for Projects as

requested by Company, subject to mutual agreement on the specifics; in all cases travel days, preparation, production work, and the like shall not be considered days of photography.

d. It is understood that the fulfillment of Contributor's services hereunder will require flexibility and cooperation on the part of both Contributor and the Publications to meet the requirements, schedules, and plans of each of the Publications, which requirements, schedules, and plans may sometimes compete with each other. It is understood that for purposes of this agreement Contributor is a New York based photographer, with a New York office and staff, and if Contributor decides to relocate, Company may continue to treat Contributor as New York-based unless Company and Contributor shall mutually agree as to another location Contributor shall be considered "based" with respect to expenses, etc. While it is agreed that Contributor may provide photographic services to other clients (as discussed more fully below), it is also agreed that Contributor will give preference to the Publications in scheduling and that Contributor will endeavor to fulfill Contributor's obligations to Company and meet the Publications' schedules before scheduling services to other clients. **It is further understood that Contributor's services are to be fulfilled during the Term hereof. If at the expiration or early termination of the Term there exists any unfulfilled services not caused by Contributor's unavailability, illness or refusal to shoot, Company shall forfeit any remaining days unless otherwise agreed with Contributor in writing. The foregoing notwithstanding, at the expiration of the Term Company shall be reimbursed (either in fees or services) for any unfulfilled Minimum Commitment days resulting from Contributor's unavailability, illness or refusal to shoot (but not for any unfulfilled days resulting from Company's failure to provide a sufficient number of Projects).**

e. The Works must be satisfactory in form, quantity and substance to Company, and must be submitted by the agreed due date. Once a shoot date has been confirmed with a Publication, Publication will contact the Contributor with proposed dates for delivery of edit and final Works. Once the delivery dates are mutually agreed upon, they cannot be changed by Contributor unless first agreed by Publication. Contributor must provide a selection of Works determined in consultation with Company, from each Project, from which Company may choose what it wishes to Publish, and upon request of Company, Contributor will provide additional Works. In all cases, Contributor shall allow the Art Director (or their equivalent) of the commissioning Publication to see all of the photographs (in digital form or otherwise) taken at any Project completed hereunder promptly after the shoot at Contributor's studio. Contributor will retain an original or other high-quality copy of all material submitted to Company. All proof prints and similar physical materials submitted to Company in connection with each Project (other than archival materials furnished by Artist) (the "Proof Prints") shall be owned by Company, and Company shall not have any liability for loss of or damage to any Proof Prints submitted to Company, regardless of cause, including as a result of negligence or more culpable conduct, and regardless of any warning or statement by Contributor, and Company has no obligation to return the Proof Prints submitted to Company; provided, however, that Company shall not make use of any Proof Prints for any purpose other

2

than as otherwise authorized hereunder, and shall not sell or transfer any of the Proof Prints to any third party (other than in connection with an acquisition of substantially all of Company's assets.

f.   No less often than every three (3) months during the Term, the parties shall schedule and hold a meeting to review the on-going performance of Contributor's services hereunder (a "Quarterly Meeting"). Prior to each Quarterly Meeting, Company shall provide Contributor with a written report stating: (i) the number of shoot days hereunder then completed or confirmed, indicating whether this number exceeds or falls short of the monthly average required to fulfill the entire Minimum Commitment; (ii) a summary of Contributor's performance during the prior portion of the Term in presenting and delivering Works to each Publication on a timely and efficient basis; (iii) a description of any other issues that Company believes need to be addressed to improve or facilitate the efficient and effective performance of Contributor's services hereunder; and (iv) a summary of the progress made toward any goals established at the prior Quarterly Meeting (if applicable). At the Quarterly Meeting the parties shall discuss each item in the report, review the progress made since the prior Quarterly Meeting, and use reasonable good-faith efforts to formulate suitable measures to rectify any shortfall in the monthly shoot-day average, to improve the process of presenting and delivering Works to each Publication, and to address any issues raised in the report.

3.  **Fee:** Company will pay Contributor a total fee ██████████████████████████████ ████████████████████████████████████████████████████████████████. Upon execution of this Agreement or as soon thereafter as practicable, Company shall pay Contributor ████████████████████████████████████. In the event Contributor completes any Projects agreed upon with Company consisting of days of photography in excess of the Minimum Commitment, such Projects ████████████████████ All fees paid by Company will encompass all compensation due to Contributor for the rights granted herein and all services and obligations and exclusivity herein except as otherwise expressly provided herein. In accordance with Contributor's request, Company will send any payments hereunder, made payable to Contributor or Contributor's designated payee ("Payee"), as indicated below. Contributor agrees that any payments to Payee of monies due to Contributor under this agreement will discharge Company's payment obligations hereunder. These payment instructions may be changed at any time by a written document signed by Contributor.

The Payee shall be AL Studio, LLC, with all payments to be made by wire transfer to the following bank account:



4.  **Expenses:** For all Projects, Company will reimburse Contributor's expenses provided that they

3

do not exceed the written, approved budget for the Project, to be determined by the applicable Publication's Editor in Chief or his/her designee in consultation with Contributor, before photography commences. Contributor will complete and submit a proposed budget to the Publication before shooting commences, and the Publication will advance to Contributor at least 50% of the approved budgeted expenses no later than five (5) business days prior to the shoot (provided the shoot budget has been approved in sufficient time to do so or, if not, immediately following such approval); the Publication will pay the remaining part of the approved budgeted expenses within thirty (30) days of its receipt of all of the receipts and documentation. Budgets must be adhered to, and any overages incurred or authorized by Contributor not approved in advance by an authorized representative of Company will be Contributor's sole responsibility. If Company is or may be held liable by a third party for any such overages, it may pay the amount owed to third parties and deduct such payments from payments due to Contributor, or, alternatively, require Contributor to reimburse it for such payments. Company shall provide Contributor notice and related correspondence relating to any such third party claims for overages and an opportunity to resolve the claim prior to deduction of any payments.

For portfolio Projects, Company will provide the assistance of a producer or producers. Contributor and Company shall mutually agree on the individual(s) to so act as producer(s) for Contributor.

When travelling to fulfill the services required hereunder Artist may fly via Business Class airfare, stay in a junior suite at the hotel of her choice chosen from the list of Company-authorized hotels, and engage the car service of her choice chosen from the list of Company-approved car services. In the event Business Class is not offered as a class of service on a flight, or Artist is flying overnight (i.e., "Red Eye") and will be performing services for Company prior to noon local time the following morning, Artist may fly First Class.

5. **Exclusivity and Restrictions:**

   a. Contributor will not during the Term execute any photographic assignments of any kind, whether editorial or non-editorial in nature, for any U. S., foreign, online, mobile, or other magazine, newspaper, or periodical publication (including those owned by Company) whether the format of delivery is print, website, app (mobile, tablet, desktop, or otherwise), television, or other media by which Publications are distributed or made available not herein described (it being agreed that "online" and "mobile" magazine, newspaper or periodical publication is not limited to sites that derive from or are associated with a print publication), whatsoever, with the following exceptions:

      (i) Contributor may do photographic shoots or project for any 1) foreign Company-owned, -affiliated, or -licensed publication, or 2) foreign-language publication licensed by Company in the United States, or 3) *The New Yorker*, on the following conditions:



4

██████████████████████████

████████████████████████████

(ii) Contributor may do photographic shoots for *Condé Nast Traveler* on the following
conditions:

    1. Company, in its sole estimation, deems Contributor on-track to fulfill
Contributor's Services required hereunder; and

    2. ████████████████████████████



b. ████████████████████████████

c. Contributor will not during the Term authorize Artist's photographs commissioned by
Company at any time, including prior to the Term hereof, to be Published in the U.S.,
foreign, online, and/or mobile editions of any of the following publications ("Restricted
Publications"): *Cosmopolitan, Elle, Elle Décor, Entertainment Weekly, Esquire,
Harper's Bazaar, Hello, InStyle* (U.S. edition only), *Interview, Life, Los Angeles, Marie
Claire, New York, Newsweek, O The Oprah Magazine, Paris Match, People, Playboy,
Rolling Stone, Slate,* any *New York Times* magazine supplements, *Time, Town &
Country, US,* and *WSJ.* Company may, in its sole discretion, at any time, change up to
four (4) publications in the foregoing list during each year of the term of this agreement,
provided that Company will give Contributor at least ninety (90) days' notice of each
such change and the total number of Restricted Publications does not increase. Any
such change shall take effect subject to any existing written contractual commitments
that Contributor may have as of the date of Contributor's receipt of such notice.  This
restriction prohibits Contributor during the Term from:

    (i)    granting or licensing any rights to any Restricted Publication in any of
Artist's photographs commissioned by Company, regardless of when the
photograph was taken (whether before or during the period Contributor is
providing services hereunder) the purpose for or circumstances under which
the photograph was taken, the subject of the photograph, or the client, if
any, for whom the photograph was taken,

5

CN071

    (ii)    supplying any such Company-commissioned photographs to any Restricted Publication, and/or

    (iii)   otherwise participating or aiding in the publication or supplying of any such Company-commissioned photographs by or to any Restricted Publication. It is agreed that the publication of photographs pursuant to paragraph 5(e) will not be a violation of this subparagraph.

Notwithstanding anything to the contrary contained in paragraphs 5(a)-(c) or elsewhere in this agreement, the parties hereto expressly acknowledge and agree that, except as provided in paragraph 5(e), Contributor may do commercial photography (meaning advertisements and publicity photographs for third parties) during the period Contributor is providing services hereunder (which commercial photography may be published in any publication, including any Restricted Publication) and that Contributor may be credited in connection therewith only when such photos are used in a commercial, non-editorial manner. Contributor must explicitly impose these restrictions in written contracts with Contributor's clients. Company is an intended third party beneficiary of such provisions and may, in its sole discretion, commence litigation or take other action to enforce such restrictions or this provision against any such client; Contributor will fully cooperate with Company in any such action. In addition, subject to the restrictions contained in paragraphs 5(a), 5(c), and 5(d), hereof, the parties hereto expressly acknowledge and agree that Contributor may do private photography (e.g., portraiture, fine-art photography not commissioned for publication) during the period Contributor is providing services hereunder, and may be credited in connection therewith. Contributor may request, on an occasional basis, that Company grant its consent for Contributor to authorize publication of a Company-commissioned photograph in a Restricted Publication, and in the event of such a request Company shall consider such request in good faith and provide a response to Contributor without delay, such determination to be in Company's sole discretion. For avoidance of doubt, it is acknowledged that nothing herein shall restrict Contributor from Publishing, or authorizing any Restricted Publication or any other publication to Publish, any photograph taken by the Artist that was not commissioned by the Company (during or before the term of this Agreement).

d.    Contributor will not during the Term promote or formally or continually be associated with any publication, or issue of a publication, other than the Publications (other than occasional biographic profiles regarding Artist and her work). This includes the authorization by Contributor of the use of Artist's name and/or likeness, and/or personal appearances by Artist.

e.    Company agrees that if a Restricted Publication publishes an article on Contributor occasioned by the publication of an upcoming photography book and/or exhibition of Contributor's work, the publication may publish in connection with such article some of the photographs appearing in Contributor's book and/or the exhibition of Contributor's work, including Company-commissioned photographs, provided that Contributor makes such use contingent upon the following conditions in a written

contract: Reprints of photographs originally published in a Publication are subject to the conditions of this agreement, including but not limited to the exclusivity provided in the Rights provisions, and must be accompanied by an on-page credit line reading "courtesy of [the particular Publication]," and regardless of where or whether the photographs were originally published, the text must include identification of Artist as a Vanity Fair contributing photographer. Though Contributor's right to grant the Restricted Publication permission to publish such photographs is contingent upon its meeting the foregoing requirements, failure on the part of a Restricted Publication to do so will not be deemed a breach of this agreement by Contributor. Nothing contained in this paragraph 5 (other than the reference to exclusivity) shall be construed to limit Contributor's own use of Works for promotion of Contributor's books, exhibitions, and sales of fine-art photographic prints, such as Contributor posting photographs on her personal website (or the website of her agent or authorized representative) or Contributor sending invitations to or promoting a book, an exhibition or sales of photographic prints. In any case where there is any reasonable doubt in Contributor's mind about whether Contributor's activities do or will comply with or violate the provisions of this agreement, Contributor will first discuss such matter with the Editors in Chief of *Vanity Fair* and *Vogue* or their designees.

f.  Contributor will not permit any fashion portfolios Published (as defined herein) by *Vogue*, or any images (published or unpublished) from the same Project as any such fashion portfolio, to be Published in whole or in part by any third party, including after the expiration of any exclusivity hereunder and after the expiration of this agreement, in any print, online, mobile or other magazine, newspaper or other periodical publication without the written approval of Anna Wintour, such approval not be unreasonably withheld. Notwithstanding the foregoing, subject to the exclusivity provisions herein, Contributor shall be free to reproduce any number of Works or other images by Contributor from any fashion portfolio in books relating to Artist's work, in connection with exhibitions of her work, and as fine-art prints exhibited and/or offered for sale.

g.  As used in this Section 5, the term "photographs" shall be deemed to include all forms of photography, including but not limited to still photography and motion-picture (e.g., film and video) photography.

6.  **Exclusive Rights:**

a.  *Publishing Rights.*  As between Contributor and Company, Contributor owns the copyright in the Works, and, subject to the exclusions specified below, hereby grants to the commissioning Publication the exclusive first worldwide right to publish, distribute, display, perform, stream, transmit, make available for download, disseminate, broadcast by air or by cable, adapt, enhance, show, compile, or otherwise use in any manner or media in connection with the content, dissemination or promotion of any Publication (collectively, "Publish" or "Publishing") each Work, which exclusivity lasts either until sixty (60) days after the Work is first Published by the commissioning Publication, or for Works that are first Published on the cover of a print Publication ("Cover Work") (and any  Work from the same Project as any

7

Cover Work and featuring the same subject as the Cover Work) until four (4)  months after the Cover Work is first Published by the commissioning Publication. If the commissioning Publication does not Publish any Works from a Project within nine (9) months of acceptance of the Works from the Project by such Publication, Contributor may request, in writing, reversion of all rights in the unpublished Works from such Project; if the commissioning Publication does not Publish the Works within three (3) months of receipt of such written request, all rights in the Works will revert to Contributor upon the expiration of such three (3) month period.  In the event that the commissioning Publication decides that the Works from a particular Project will not be Published (i.e., are "killed") the foregoing exclusivity to the killed Project shall terminate and the commissioning Publication shall immediately revert all rights in such killed Works to Contributor. Contributor will not Publish or allow anyone else to Publish any of the Works (including Cover Works) for any purpose until the applicable exclusivity period has expired, including after the Term has expired or been terminated. Company's exclusivity extends to each and every Work taken at or created for or as a result of the applicable Project until the applicable exclusivity period has expired. Contributor will not allow any Cover Work (or any Work similar to a Cover Work) to appear on the cover, home page, or landing page of any other publication, in any media, at any time, without Company's prior written permission, including after the Term has expired or been terminated. For the purposes of this agreement, a Work shall be deemed "similar" to another Work if both Works were created at the same Project and depict the same person (or subject matter) in the same or a materially similar set-up.

b. *BTS Rights.*  Company shall have the right to create "behind-the-scenes" and "making of" photography (still and/or video) documenting the preparation, shoot, and completion of each Project by Artist and her team ("BTS Photography"), including depiction of the Artist therein as she executes such Project, and to make use of such BTS Photography in promoting, advertising and publicizing the Publication(s) in which the Work(s) from the applicable Project will appear, including the right to make reasonable use of BTS Photography in social media (e.g., Instagram, Facebook, Twitter, YouTube, etc.).  Company shall not exercise its right to create the BTS Photography in any manner that materially interferes with Contributor's ability to perform the applicable assignment. The final BTS Photography, and the edit thereof, to be used publicly shall be subject to Contributor's prior approval, not to be unreasonably withheld, delayed or conditioned, and shall not include any material that Contributor reasonably deems derogatory, embarrassing, and/or private.  Company shall provide Contributor with notice of Company's intent to create BTS Photography no later than seven (7) days prior to the applicable shoot, and, whenever time permits, the person or team to be engaged to create the BTS Photography (the "BTS Crew") shall be subject to Contributor's prior written approval, not to be unreasonably withheld, delayed or conditioned.  The parties shall develop and agree upon a set of written guidelines that specify the protocols and policies to be followed by each BTS Crew; and each BTS Crew shall be provided in advance with a copy of such guidelines and shall be contractually required to follow them.

7. **Nonexclusive Rights:** Contributor also grants Company, for the full term of copyright, the non-exclusive right to Publish, print, re-Publish, and reprint the Works (including in anthologies as permitted below), the unrestricted right to use any cover containing any Work(s) **as a cover** (i.e., in the original cover layout) for any purpose at any time, the right to make and authorize

8

the making of reprints or stand-alone copies of the article or feature including any Work(s) for any purpose, the right to authorize the use of any Work(s) in the original layout shown in the applicable Publication as set dressing or props in movies, television shows, and other productions, and in addition, the right to use any Work(s) and/or Contributor's name and/or approved photographic likeness in Publishing, promoting, advertising and publicizing the Publication(s) in which the Work(s) appear.

8. **Miscellaneous Rights; Exclusions; Exercise:**

   a. *Miscellaneous Rights.* Contributor hereby authorizes Company to determine in its sole discretion whether, when, and how to Publish any Work, and Contributor further grants to Company the right to crop, retouch, edit, and otherwise modify the form and/or contents of the Works in close consultation with Contributor. It is anticipated that Works used in electronic and online versions of the applicable Publication shall be used materially in the same manner as the print version with respect to the selection of Works used, the final version of each, and the layout in which each appears. Any Publishing of Works by Company in electronic and/or online media in a manner which materially differs from the manner which such Works are to be Published in print editions shall only be done in close consultation with Contributor. To the extent that such modifications are not material in this regard, any modifications of the Works solely for purposes of compatibility with or optimization for different platforms, sources, or devices shall not be subject to the foregoing consultation requirement. Upon Company's request, Contributor will be available for and will cooperate with Company's fact checking and will supply Contributor's research material relating to the Works. In the event Company returns any original materials to Contributor, Contributor shall promptly loan them to Company upon Company's reasonable request. Contributor waives or agrees not to exercise (to the extent permitted by applicable law) all moral rights or similar rights in respect of the uses to be made of the Works under this agreement to which Contributor may now or at any future time be entitled under any relevant law in force anywhere in the world.

   b. *Exclusions:* Notwithstanding the foregoing, the rights granted in this agreement to Company do not include the right to use any Work, or Artist's name or likeness (or other personal indicia), for any the following purposes: (i) the advertising or promotion of any third-party product, service or brand; (ii) merchandising; (iii) third-party syndication and/or licensing other than as expressly permitted herein or as otherwise agreed; (iv) any anthology, book, collection, portfolio, exhibition or similar publication or project in which photographs by Artist comprise forty percent (40%) or more of the photographs (and/or artworks) included therein ; or (v) any usage or exploitation unrelated to any of the Publications and/or Company (i.e., the CONDÉ NAST brand).

   c. *Exercise of Rights:* Contributor hereby authorizes Company to exercise (without the obligation to do so) the rights granted herein in any and all media now in existence or hereafter developed, throughout the world, including but not limited to all of the Company's present and future Publications, books, audiovisual productions, Internet or mobile sites, apps, and digital and other archives and databases in context of the Publication in which the Work was Published. In doing so Company may arrange with third parties for producing and

9

distributing its Publication(s) containing the Work(s) or portions thereof, or material from Company's Publication(s) in a collection, section, manner, or area identified as being associated with the applicable Publication in which the Work was Published. Any uses of Contributor's Works not otherwise expressly authorized herein shall be governed by a separate agreement between Contributor and Company.

9. **Foreign Rights:** Contributor hereby authorizes Company to allow any of Company's owned or licensed Publications outside of the United States, and/or foreign language Publications in the United States (in each case "Foreign Publication") to acquire, without payment of any fee, the exclusive first Publishing rights to each Work in the Foreign Publication's country and/or language, such exclusivity to last for sixty (60) days after the applicable Work is first Published by the Foreign Publication. The Foreign Publication may acquire the rights by giving notice thereof to Company within thirty (30) days after the Work is first Published in the original Publication. The other Rights (not including exclusivity), Warranty and Miscellaneous provisions of this Agreement shall apply to such use by the Foreign Publication.  The Foreign Publication's right to first Publish any Work optioned pursuant to this paragraph shall expire thirteen (13) months after the applicable Work is first Published in the original Publication

10. **Right of First Refusal (Serial Rights):** Company shall have the right of first refusal on all serial rights to any books of Artist's works published under Contributor's or Artist's authority during the Term or within three (3) months thereafter; if Company does not purchase such rights in any instance, the rights may not be granted to another publisher on terms better (to the publisher) than those offered to or by Company (provided Company remains willing and able to honor such terms). The foregoing right is subject to Contributor's contract with the book's publisher, provided however that no provision in favor of another periodical publisher in any such contract shall override this provision.

11. **Reservation of Rights:** All rights with regard to the Works not expressly granted herein are retained by Contributor.

12. **Crediting:** a) Artist will be credited as the photographer, whenever reasonably possible.

   b) Whenever Artist's photographs are distributed to the news media for promotion purposes, the Publication will notify the recipient that:

   (i) Artist must be credited as the photographer;
   (ii) the photographs are provided for one-time use only in connection with the issue of Publication they are being used to promote; and
   (iii) the cover of the issue of Publication that the photographs are being used to promote must be used in conjunction with the photographs.

   (c) If any other person who is not a Company employee is listed in a contributing or similar capacity on the masthead of *Vanity Fair*, Artist's name and title ("Contributing Photographer") will also be so listed, with no other photographer listed before or given a greater title than Artist. *Vogue* shall have the right, but not the obligation, to list Artist's name in the same manner

10

on the masthead of *Vogue*.

Company may on occasion deviate from items (b) (ii) and (b) (iii) if and when such deviation is reasonably necessary.

13. **[Reserved]**

14. **Additional Projects**: If Contributor performs any Projects for other Company Publications during the Term without a contract signed by the party against whom enforcement is sought, the provisions of this agreement (other than the Fee and the first sentence of the Services section) will govern any such Project.

15. **Releases/Restrictions:**

    a. **Releases:** Company (or the applicable Publication) will have sole responsibility for obtaining any and all releases, permissions, consents and clearances required with respect to each person and each item of property depicted in the Works and (other than Artist herself) in the BTS Photography ("Releases") in connection with Company's use of the Works and the BTS Photography; and Company will hold Contributor harmless from and against any claims by any person arising from any failure by Company to obtain any such Release. Contributor will have sole responsibility for obtaining all Releases required with respect to Contributor's own separate use of the Works. Contributor may not agree to any restrictions, limitations, or right to review requested or imposed by any persons, including models, owners of property pictured in the Works, or others, other than solely in connection with Contributor's own separate use of the Works. Contributor will immediately advise Company of any such request or attempted imposition.

    b. **Borrowing Property:** Contributor may not obtain or borrow any objects or property, lease any location, or enter into a legally binding commitment to a third party, on behalf of Company without first obtaining Company's express written consent.

    c. **Commercial/Advertising Use:** Contributor will not allow any of the Works that are Published in a Publication, or any Works similar to such Works, to be used for any commercial, merchandising, or advertising purpose (including for posters) ("Commercial Exploitation") unless Contributor first obtains Company's written consent, which Company may withhold in its sole discretion. This requirement will continue to apply after the Company's period of exclusivity has passed, and/or (ii) after this agreement has expired or been terminated as long as Contributor and Company still have a professional contractual relationship. In the event this agreement expires or is terminated without such a new contractual arrangement being entered into, the prohibition on use of similar photographs shall expire three (3) years after the expiration or effective date of termination of the agreement. The term "merchandising" in this provision shall not be construed to include sale by Artist or Contributor of prints of photographs; and the sale of Artist's books and/or fine-art photographic prints, and advertising promoting such sales, and exhibitions of Artist's photographs, and

11

advertising promoting such exhibitions, shall not be deemed Commercial Exploitation.

d. **Subsequent Use:** If Contributor makes any subsequent or other use of any Work, Contributor is solely responsible for obtaining any necessary releases from any models, persons, or owners of property pictured in the Work. Contributor will hold Company harmless from and against any claims by any person arising from any subsequent or other use.

e. **Credits on Subsequent Use**: In the event Contributor grants to any other person or entity the right to reproduce any photographs taken under this agreement, if permitted herein, Contributor will inform the subsequent purchaser of the relevant stylist and hair and makeup artists' names for the purpose of crediting, and Contributor will include in a contract with the subsequent publisher a requirement that it credit the applicable Publication as the original publisher, contiguous or close to each such photograph.

16. **Confidentiality:** The terms of this agreement, and the subject, contents, and circumstances of each Project and Work under this agreement and all details relating thereto, will be held confidential by Contributor and may be discussed by Contributor only with those individuals necessary for the preparation of the Work(s). Contributor will not allow anyone outside of the applicable Publication (including but not limited to the subjects and the subjects' representatives) to view the Work(s) or portions thereof before publication. Contributor shall be responsible for notifying and assuring the compliance of any assistants, service producers, and other third parties engaged by Contributor to the foregoing restrictions. Without limiting the generality of the foregoing, Contributor and any assistants, service providers, or other third parties working with Contributor may not tweet, blog about, post, reveal, or otherwise disseminate any of the information or materials covered by the confidentiality obligations herein, including but not limited to copies of photographs or descriptions of photo shoots. Specific information that enters or is already in the public domain through no fault or participation of Contributor, or any assistant, service provider, or third party working with Contributor, will not be subject to the confidentiality terms of this paragraph.

17. **Warranty:** Contributor represents and warrants that the Work(s) will be original work by Contributor, will not have been previously Published in any form, and, exclusive of the depictions of persons and items of property appearing in the Works, will not infringe the copyright of any third party or, to the best of Contributor's knowledge, defame, invade the privacy of, or violate any law or give rise to any claim by any third party. In addition, in the event any complaint relating to any Work is made by any third party at any time, whether by a formal legal claim or otherwise, Contributor will fully cooperate with Company in responding to and defending against such complaint or claim. **Company shall defend and indemnify Contributor against any claims and damages to the extent they arise directly as a result of Contributor's use of material as directed by Company or actions in following specific instructions from Company.**

18. **Independent Contractor:** Contributor is an independent contractor and will not be treated as or considered an employee of Company for any purpose, including but not limited to Company's employee benefits, unemployment taxes, Federal, state, and local tax purposes, the Federal

Insurance Contribution Act, and income tax withholding at the source. Nothing herein shall create, expressly or impliedly, a partnership, joint venture, or other association between the parties to this Agreement. Contributor acknowledges and agrees that Contributor is not entitled to benefits under any employee benefit plan of the Company, even if (1) any court or other tribunal or government agency adjudicates or otherwise finds that Contributor is a common law employee of the Company or (2) Contributor is deemed to be a common law employee of the Company for any other purpose. Contributor represents that (x) Contributor is in full compliance with the immigration laws of the United States and will maintain such compliance while this Agreement remains in effect; and (y) Contributor is authorized to engage in business and/or provide services in the United States. Contributor is responsible for compliance with all applicable laws, rules, and regulations as concerns anyone Contributor uses to perform services under this Agreement. Contributor specifically acknowledges, and Company states, that Contributor has no actual, implied or apparent authority to act as an agent or employee of Company; to enter into any contractual commitments on behalf of Company; or to incur any obligations, debt or liability for Company. Contributor will indemnify Company with respect to all losses, claims, damages, expenses and liabilities (including reasonable attorneys' fees) arising out of any acts or omissions of Contributor that are not consistent with the terms of this paragraph, and, including any claim or liability for taxes, penalties and/or interest that may be assessed against Company by reason of Contributor and/or anyone Contributor uses to perform services under this Agreement being deemed an employee of Company.

19. **Termination/Breach:** If Contributor is not in material compliance with the terms of this agreement, and does not cure such breach within thirty (30) days of Company's written notice to Contributor of such breach, Company may, in addition to its other remedies, terminate this agreement and cease making the monthly payments. The Rights, Crediting, Releases/Restrictions (a), (c), (d), and (e), Confidentiality, Warranty, and Miscellaneous provisions shall survive any termination or expiration of this agreement. If Company fails to make payments to Contributor as required hereunder, and does not cure such failure with thirty (30) days of Company's receipt of Contributor's written notice to Company of such failure, Contributor may, in addition to Contributor's other remedies, terminate this agreement.

20. **Miscellaneous:** This agreement sets forth the entire agreement of the parties, supersedes all prior agreements between the parties with respect to the subject matter hereof, will not be binding on either party until fully executed by both parties and may not be altered except in a document signed by the party to be bound thereby. No contrary or inconsistent terms, conditions, restrictions, or other provisions in delivery memos, invoices, letters, or other documents will be binding on a party unless expressly agreed to in writing by that party. If any provision of this agreement is for any reason or in any jurisdiction held invalid or unenforceable, such fact will not affect any other provision hereof, and this agreement will thereafter be interpreted as if such provision had not been contained in the agreement, in such jurisdiction. This agreement and any rights hereunder are separately or collectively assignable in whole or in part by Company as part of a transfer or reorganization of any part of the business to which it relates. This agreement may not be assigned by Contributor unless to an entity owned and controlled by Contributor with written notice to Company; in all cases the Personal Guaranty shall remain in effect. Any notice to Company must be sent by Certified Mail, Return Receipt Requested, or delivered personally, and must be addressed to the attention of Contract Department, with a copy to Sabin, Bermant &

13

Gould LLP, One World Trade Center, 44th floor, New York, NY10007, Attn: Jerry Birenz. This agreement will be governed by the laws of the United States of America and the State of New York applicable to contracts to be wholly performed therein to the extent permitted by the law of any jurisdiction in which the agreement is sought to be enforced. Any action against Company based on or alleging a breach of this agreement must be brought in the state or federal courts in New York, New York. Company may bring an action, including for tort, against Contributor in the state or federal courts in New York, New York, or wherever Contributor may be located.

21. **Power of Attorney:** If this agreement is executed by an agent or representative on Contributor's behalf, said agent or representative represents and warrants that it has full right and authority, pursuant to a currently valid Power of Attorney from Contributor, to make this agreement on behalf of and to bind Contributor, including the grant of rights and warranties and representations specified herein, and will indemnify Company against any claims of any nature arising from said agent or representative's execution of this agreement. Upon Company's request, said agent or representative will provide to Company the above-specified Power of Attorney.

If you are in accord with the provisions of this agreement, please sign both copies of this contract and return them to me. I will then submit them for signature by an officer of Condé Nast and will return one copy to you.

*(signature page follows)*

14

Very truly yours,

AL STUDIO, LLC

BY:

DATE: 11/17/2022

ADVANCE MAGAZINE PUBLISHERS
INC. d/b/a CONDÉ NAST

Christiane Mack (Nov 23, 2022 12:20 EST)

BY:   Condé Nast

DATE: Nov 23, 2022

15

GUARANTY RIDER TO AGREEMENT DATED AS OF APRIL 1, 2021 BETWEEN


**AL STUDIO, LLC** AND **CONDÉ NAST**


I, **Annie Leibovitz,** personally guaranty to Advance Magazine Publishers Inc. d/b/a Condé
Nast ("Company") the performance by **AL STUDIO, LLC** of all of its obligations and liabilities
under the contract dated **November 17, 2022** between **AL STUDIO, LLC** and Company.
This guaranty relates to creation of works, payment of monies, performance of acts,
restrictions, exclusivity, or any other obligations or liabilities of any nature under the
aforesaid contract as if it stated that they apply directly to me. I hereby waive notice of any
and all defaults on the part of **AL STUDIO, LLC** and agree that Company may look directly
to me for fulfillment of this Guaranty, without any obligation to first request performance from
or proceed against **AL STUDIO, LLC.** I understand that Company is relying on this Guaranty
in entering in to the aforesaid contract.

**Annie Leibovitz**

Date

16

**SCHEDULE A**

**[MAGAZINE LETTERHEAD]**

**Photographic Project Work Order**

**With respect to Agreement dated as of April 1, 2021 between
Contributor and Condé Nast**

Date: SAMPLE

Contributor: SAMPLE

Subject/Description of Project: SAMPLE

Shooting Dates: SAMPLE

Due Date for Initial Edit: SAMPLE

Due Date for Final Images:   SAMPLE

Fee: SAMPLE

Expenses: SAMPLE

Notes: SAMPLE

This project, and all material created and services rendered in connection with this project, are subject to the terms of Contributor's above-specified written agreement with Condé Nast, including but not limited to the grants of Rights set forth therein. This Work Order is a Schedule to and an integral part of the aforementioned written agreement.

Any reimbursable expenses must be approved in writing in advance.

AL Studio, LLC                              Condé Nast

By: _Then Milligan_                         By:_____
_Agent, Annie Leibovitz_
Date:___11/17/2022____                     Date:_____

17